UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

PERINI/O&G, A JOINT VENTURE,

                Plaintiff,

      -against-

USIMINAS MECÂNICA S.A. and USINAS
SIDESÚRGICAS DE MINAS GERAIS S.A. -
USIMINAS,

                    Defendants.

-------------------------------------------------------------x

Case No. 12 CV 1931 (VB)

**PLAINTIFF'S RESPONSE TO
DEFENDANT
USIMINAS MECÂNICA S.A.'s
STATEMENT OF
UNCONTESTED FACTS**

DUANE MORRIS LLP
1540 Broadway
New York, New York 10036
Tel.: (212) 692-1000
Fax: (212) 692-1020

*Attorneys for Plaintiff Perini/O&G, A Joint Venture*

Pursuant to Rule 56 of the Federal rules of Civil Procedure and Local Civil Rule 56.1 of the Southern District of New York, Plaintiff Perini/O&G, a Joint Venture ("POG") respectfully submits its response to Defendant Usiminas Mecânica S.A.'s ("Usiminas") proposed Statement of Uncontested Facts:

## I.    The Purchase Order

1.    Perini Corporation / O&G Industries, Inc., A Joint Venture ("POG"), and the Triborough Bridge and Tunnel Authority ("TBTA") entered into the Contract (the "Prime Contract") captioned as "Bronx-Whitestone Bridge Contract No. BW-82, Replacement of Roadway Deck In Suspended Spans" (the "Project") on December 24, 2003.  (*See* Declaration of Jeffrey G. Gilmore ("Gilmore Decl."), Exhibit ("Ex"). 1, Purchase Order, p. 2; Gilmore Decl., Ex. 11, Flynn Dep. Tr. 181-182).

**Undisputed.**

2.    POG entered into a Purchase Order with UMSA, dated December 19, 2003, for the fabrication and supply of orthotropic steel deck panels to POG, in support of POG's Contract with the TBTA.  (*See* Gilmore Decl., Ex. 1, Purchase Order, p. 2; Gilmore Decl., Ex. 11, Flynn Dep. Tr. 181-182).

> **Undisputed.**  It is undisputed that POG and Usiminas entered into a Purchase Order for the fabrication and supply of orthotropic steel deck panels to POG, in support of POG's Contract with the TBTA.
>
> **Disputed.**  The cited evidence does not establish the proposed fact.  The Purchase Order was signed by POG on March 5, 2004 and was effective December 19, 2003; and did not call for only the orthotropic steel decks. (Gilmore Decl., Ex. 1, Purchase Order p. 2-9)

3.    Zohrab B. Marashlian, Managing Partner of POG, signed the Purchase Order on behalf of POG.  (*See* Gilmore Decl., Ex. 1, Purchase Order, p. 9; Gilmore Decl., Ex. 11, Flynn Dep. Tr. 52:10-22).

DM1\4657985.1

**Undisputed.** Zohrab Marashlian signed the Purchase Order.

**Undisputed.**   The cited evidence does not establish the proposed fact. Zohrab Marashlian signed the Purchase Order as President of Perini Corporation, which was the Managing Partner of the joint venture. (Flynn Dep. Tr. 52: 8-22; Affidavit of Terrence M. Flynn sworn to the 7th of May, 2014 ("Flynn Aff.") ¶ 1, 3; Gilmore Decl., Ex. 1, Purchase Order, p. 9).

4.     POG's Purchase Order to UMSA, dated December 19, 2003, references the prime contract between POG and TBTA, including its specifications, and other documents by stating:

The Contract Documents for this Purchase Order consist of this Agreement, Exhibit "A" "Agreed Payment Terms" and any other exhibits attached hereto, the Prime Contract between the Owner and the Contractor dated December 24, 2003, the General, Supplementary and any other Conditions of the Prime Contract, Drawings, Specifications, all Addenda issued by Owner prior to the execution of this Purchase Order, the Project Schedule, any other documents listed in or referred to by the Prime Contract, and the Letter Agreement dated December 19, 2003, between the Owner and the Contractor.

(Gilmore Decl., Ex. 1, Purchase Order, p. 2).

All of the above Contract Documents form this Purchase Order and are fully incorporated herein.   The Contract Documents are available in the Contractor's office and Vendor acknowledges that he has examined them and understands them completely.

(Gilmore Decl., Ex. 1, Purchase Order, p. 2).

**Undisputed.**  The Purchase Order includes the quoted language.

**Disputed.**  Usiminas' characterization of what the Purchase Order states is incomplete, inaccurate and misleading in that, e.g., the prime contract and related documents were incorporated by reference into the Purchase Order. (Gilmore Decl., Ex. 1, Purchase Order, p. 2).

5.     The Purchase Order contains a clause where specific references to the defined term "Contractor" in the Prime Contract Specification Section 05100 are to mean UMSA instead of POG.   (Gilmore Decl., Ex. 1, Purchase Order, p. 9).   This clause states "[r]eferences to

'Contractor' in Spec Section 5100 will mean fabricator as per sheets 1 of 2 and 2 of 2 dated

12/17/03." (Gilmore Decl., Ex. 1, Purchase Order, pp. 9; Gilmore Decl., Ex. 12, pp. 1-2).

> **Undisputed.** That the Purchase Order states "References to 'Contractor'
> in Spec. Section 5100 will mean fabricator as per sheets 1 of 2 and 2 of 2
> dated 12/17/03."

> **Disputed.** Usiminas' characterization of what the Purchase Order states is
> incomplete, inaccurate and misleading. (Gilmore Decl., Ex. 1, Purchase
> Order, p. 9; Gilmore Decl. Ex. 12, pp. 1-2, Flynn Aff. ¶ 8.)

6.    The Purchase Order issued by POG to UMSA contains the following language:

> Seller expressly warrants that items and work covered by this order will conform
> to the specifications, drawings, design, plans, data, or other description furnished
> or specified by the Buyer, will be fit and sufficient for the purpose intended,
> merchantable, of good material and workmanship and free from defects. Seller
> agrees that this warranty shall survive acceptance of the items of work. Said
> warranty shall be in addition to any warranties of additional scope given to Buyer
> by Seller.

(Gilmore Decl., Ex. 1, Purchase Order, p. 10, ¶ 7).

> **Undisputed.** The Purchase Order includes the quoted language.

> **Disputed.** The Purchase Order was negotiated between the parties over
> several days. (Flynn Aff. 5, 6, 7, 8.)

7.    The Purchase Order is governed by the Uniform Commercial Code as adopted by

New York. (*See* Gilmore Decl., Ex. 1, Purchase Order, p. 10, ¶ 15).

> **Undisputed.** The Purchase Order states that "it is governed by the
> Uniform Commercial Code".

8.    Terrence M. Flynn, POG's corporate representative under Federal Rule of Civil

Procedure 30(b)(6), was the primary author of the technical aspects of the Purchase

Order. (Gilmore Decl., Ex. 11, Flynn Dep. Tr. 83-84).

> **Undisputed.**

## II.      General Terms and Conditions of the Prime Contract between POG and TBTA

9.      The Prime Contract between POG and TBTA contains a warranty clause in Article 9.04

of its terms and conditions captioned as "WARRANTY OF CONSTRUCTION" that states in

pertinent part:

> For a period of one year from the date of Substantial Completion, the Contractor warrants that the Work conforms to the Contract requirements and is free of any patent or latent defect of the material or workmanship.  Nothing in the above intends or implies that this warranty shall apply to work which has been abused or neglected by the Authority or the user of the structure upon which the work is performed.

and

> In case the Contractor shall fail to repair or replace defective work in accordance with the terms of this warranty or if immediate repair or replacement of defective work is necessary, the Authority shall have the right to cause such repair or replacement to be made at the expense of the Contractor.  All such work performed by [TBTA] employees shall be charged to the Contractor in accordance with the [TBTA]'s "Schedule of Rates For Services Rendered To Outside Parties" in effect at the time the repair or replacement is made.

(Gilmore Decl., Ex. 3, Prime Contract ch. 9, p. 2, art. 9.04(a), (d); Gilmore Decl., Ex. 11,

Flynn Dep. Tr. 208-210).

> **Undisputed.**  The referenced clause contains the quoted language, except for the two (2) inserts of "[TBTA]" which should read "Authority".

> **Disputed.**  Usiminas' characterization of the quoted language as the "pertinent part" is incomplete, inaccurate and misleading and is a judgment or conclusion, not a fact.

10.      As used in Article 9.04 of the Prime Contract between POG and TBTA, the term "Work"

means "all matters and things herein agreed to be constructed, furnished, installed, or done, by or

on the part of the Contractor and includes Miscellaneous and Incidental Work." (Gilmore Decl.,

Ex. 2, Prime Contract ch. 1, p. 1, art. 1.01(c); Gilmore Decl., Ex. 11, Flynn Dep. Tr. 207-209).

> **Undisputed.**  The prime contract between POG and TBTA includes the quoted language in Article 1.01(c).

DM1\4657985.1

11.     As used in Article 9.04 of the Prime Contract between POG and TBTA, the words "Contract" and "Contract Documents" collectively mean "the Information for Bidders, the Bidder's Proposal, the Contract Terms And Conditions, the Specifications, all Addenda issued, the Specifications, the Forms Of Bonds, the Appendix, the Contract Drawings, and the Notice Of Award, as applicable." (Gilmore Decl., Ex. 2, Prime Contract ch. 1, p. 2, art. 1.02(7)).

> **Undisputed.**   The prime contract between POG and TBTA includes the quoted language in Article 1.02(7).

12.     As used in Article 9.04 of the Prime Contract between POG and TBTA, the word "Contractor" means the "individual, firm, or corporation, its successors and assigns, that enters into the Contract to perform the Work.  The Contractor is an independent contractor and as such is not, an agent, employee, or officer of the Authority or the MTA.  For convenience, the Contractor is hereinafter referred to as if the Contractor were an individual." (Gilmore Decl., Ex. 2, Prime Contract ch. 1, p. 2, art. 1.02(8)).

> **Undisputed.**   The prime contract between POG and TBTA includes the quoted language in Article 1.02(8).

> **Disputed.**   What the stated words "mean" is not a fact, but a conclusion. (Flynn Aff., ¶ 26.)

13.     As used in Article 9.04 of the Prime Contract between POG and TBTA, the term "Subcontractor" means "any person, firm or corporation, other than the employees of the Contractor, who contracts to furnish labor, or labor and materials, at the Work Site or in connection with the Project, whether directly or indirectly on behalf of the Contractor." (Gilmore Decl., Ex. 2, Prime Contract ch. 1, p. 4, art. 1.02(40)).

> **Disputed.**   The cited evidence does not establish the proposed fact. Article 9.04 does not contain the term "Subcontractor". (Gilmore Decl., Ex. 3, Prime Contract ch. 9, p. 2, Art. 9.04).

6

14.    Article 9.05 of the Prime Contract's terms and conditions, captioned as "SPECIFIC GUARANTEES", states: "[a]dditional guarantees and warranties required under the Contract are set forth in the Specifications." (Gilmore Decl., Ex. 3, Prime Contract ch. 9, p. 2, art. 9.05).

> **Undisputed.**   The prime contract between POG and TBTA includes the quoted language.

15.    Specification Section 05100 for the Project, captioned as "DIVISIONS 5 – METALS, SECTION 05100, STRUCTURAL STEEL" omits any special guarantees or warranties from the manufacturer of the orthotropic steel deck panels. (Gilmore Decl., Ex. 11, Flynn Dep. Tr. 185:6-13; *see also* Gilmore Decl., Ex. 4, Structural Steel Specification, pp. 1-40).

> **Disputed.**   The cited evidence does not establish the proposed fact.   The use of the phrase "omits" is a characterization and suggests deliberative or purposeful action, which is disputed.   The use of the phrases "special guarantees or warranties" is language not within the specification cited or in any of the definition sections cited in Usiminas' Statement. Specification Section 5100 contains no reference to the "manufacturer" of the orthotropic steel decks.   (Gilmore Decl., Ex. 4, Structural Steel Specification, pp. 1-40).

### III.    Specifications to the Prime Contract between POG and TBTA

16.    The specification that relates to the rib-to-deck welds for the Project is "DIVISION 5 – METALS, SECTION 05100, STRUCTURAL STEEL" ("the Structural Steel Specification"). (*See* Gilmore Decl., Ex. 1, Purchase Order, pp. 1-7, 9).

> **Undisputed.**   While generally undisputed, the specifications cited within Section 05100 are also applicable. (Gilmore Decl., Ex. 4, Structural Steel Specification, pp. 1-40).

17.    The Structural Steel Specification sets forth, among other things, quality assurance provisions, fabrication guidelines, inspection and non-destructive testing procedures for the various welds UMSA was required to make, and payment provisions. (*See* Gilmore Decl., Ex. 1,

Purchase Order, pp. 1-10; *see also*, Gilmore Decl., Ex. 4, Structural Steel Specification, pp. 1-40).

> **Disputed.** The proposed fact is a characterization which is incomplete, inaccurate and misleading. (Gilmore Decl., Ex. 4, Structural Steel specification, pp. 1-40).

18.   Unlike the Structural Steel Specification, other specifications to the Prime Contract between POG and TBTA include special warranty provisions. For example, "DIVISION 9 – FINISHES, SECTION 09930, PAINTING REQUIREMENTS" (the "Painting Specification"), "SECTION 16321, TRANSFORMERS (DRY TYPE, UNDER 600V)" (the "Transformer Specification"), and "SECTION 16500, LUMINAIRES" (the " Luminaires Specification"), included warranty provisions. (Gilmore Decl., Ex. 5, Painting Specification, pp. 42-43, art. 3.10; Gilmore Decl., Ex. 6, Transformer Specification, pp. 2-3, art. 1.06; Gilmore Decl., Ex. 7, Luminaires Specification, pp. 3-4, art. 1.06(B)(2)).

a.   The Painting Specification cross-references Article 9.05 of the Prime Contract. More specifically, the Painting Specification provides:

> In accordance with Article 9.05 SPECIFIC GUARANTEES of the Contract Terms and Conditions, a one-season anniversary inspection will be conducted during the first winter after Substantial Completion of the Work. The Contractor shall participate in this inspection with the Authority. The Contractor shall at all times provide the Engineer and his designated representatives all facilities (e.g., bucket trucks, underdeck bridge inspection units (UBIUs), moogs, ladders, impact attenuators, shadow vehicles, traffic cones, and other access and MPT equipment, etc.) necessary, convenient or desirable for inspecting the applicable Work.

(Gilmore Decl., Ex. 5, Painting Specification, pp. 42-43, art. 3.10(A)(1)).

> The Contractor's obligation under this warranty and guarantee shall be, at its own cost and expense, to promptly repair or replace (including the cost of removal and installation) those surfaces that exhibit disbonding, cracking, rusting or otherwise prove defective

8

or fail to comply with the Contract Documents. The Contractor shall perform all repairs in accordance with the requirements of this Section and the coating manufacturer's written instructions.

(Gilmore Decl., Ex. 5, Painting Specification, p. 43, art. 3.10(A)(2)).

b.  In the Transformer Specification, the "Manufacturer" agreed to "warrant the equipment and the start-up service to be free from defects in materials and workmanship for a period of three years from date of start up." (Gilmore Decl., Ex. 6, Transformer Specification, p. 3, art. 1.06(B)). The "Manufacturer" further agreed that if any defects appeared under the warranty, it would "provide both replacement parts and labor at no cost to the [TBTA]." (Gilmore Decl., Ex. 6, Transformer Specification, p. 3, art. 1.06(C)).

c.  The Luminaires Specification establishes that the Fabricator, "by commencing the Work of this Section assumes overall responsibility, as a part of his warranty of his Work, to assure that assemblies, components and parts shown or required within the Work of this Section, comply with the Contract Documents." (Gilmore Decl., Ex. 7, Luminaires Specification, p. 3, art. 1.06(B)(1)). The warranty period in the Luminaires Specification was for "a period of one year after Owner's initial acceptance and establishment of the beginning date of the warranty period ...." (Gilmore Decl., Ex. 7, Luminaires Specification, p. 3, art. 1.06(B)(2)(a)).

**Disputed.** The proposed fact is not established by the evidence cited and is a characterization which is incomplete, inaccurate and misleading. Specification Section 09930, Section 16321 and Section 16500 do not refer to "special" warranty provisions.

Whether the Structural Steel Specification is "unlike" (or "like") other specifications is not a fact, but a characterization or conclusion.

Specification Section 09930 also provides that "all painting work performed by the Contractor under this Contract shall be subject to the warranty and guarantee provisions of Chapter 9, Inspection, Testing and Guarantee of the Contract Terms and Conditions".

9

There are no "agreements" within the Transformer Specification.

Specification Section 16321 and Section 09930 are not applicable to the Usiminas Scope of Work and do not "establish" any facts regarding Usiminas' Work or Purchase Order requirements. (Gilmore Decl., Ex. 5, Painting Specification, p. 42, Art. 3.10A; Gilmore Decl., Ex. 6, Transformer Specification, pp. 2-3, Art. 1.06; Gilmore Decl., Ex. 7, Luminaire Specification, pp. 3-4, Art. 1.06(B)(1) and (2); Flynn Aff. ¶ 3, fn. 1.)

## IV.   Delivery of Orthotropic Steel Deck Panels and Subsequent Dispute

19.   According to POG's sworn interrogatory responses and deposition testimony from a POG Federal Rule of Civil Procedure 30(b)(6) representative, UMSA delivered all of the orthotropic steel deck panels to POG prior to August 30, 2006. (Gilmore Decl., Ex. 10, Pl's Am. Answers to Def's Second Set of Interrog., p. 3; Gilmore Decl., Ex. 11, Flynn Dep. Tr. 127-128).

**Undisputed.**

20.   On July 6, 2006, POG and UMSA entered into a liquidation agreement (the "Liquidation Agreement"). (Gilmore Decl., Ex. 8, Liquidation Agreement, p. 1; Gilmore Decl., Ex. 11, Flynn Dep. Tr. 86).   Zohrab B. Marashlian, President of Perini Corporation, acting as the managing partner of POG,[1] drafted and executed the Liquidation Agreement on behalf of POG.   (Gilmore Decl., Ex. 11, Flynn Dep. Tr. 84-93).

**Disputed and immaterial.**   The proposed statement of fact was not cited in Usiminas' memorandum of law and does not form the basis of Usiminas' motion for summary judgment. Therefore, the proposed fact is immaterial and inadmissible for purposes of Usiminas' motion for summary judgment and should be stricken from Usiminas' Rule 56.1 Statement.

21.   According to deposition testimony from POG's Federal Rule of Civil Procedure 30(b)(6) representative, POG considers the Liquidation Agreement to be a binding contract. (Gilmore Decl., Ex. 11, Flynn Dep. Tr. 88-89).

---

[1] (Gilmore Decl., Ex. 11, Flynn Dep. Tr. 52:10-22).

> **Disputed and immaterial.** The proposed statement of fact was not cited in Usiminas' memorandum of law and does not form the basis of Usiminas' motion for summary judgment. Therefore, the proposed fact is immaterial and inadmissible for purposes of Usiminas' motion for summary judgment and should be stricken from Usiminas' Rule 56.1 Statement.

22.   On or about March 9, 2011, a jury found Zohrab B. Marashlian guilty of certain procurement fraud charges related to bridge and highway construction projects in the New York metropolitan area in a trial conducted in the United States District Court for the Eastern District of New York. *See* Jury Verdict as to Zohrab B. Marashlian, *U.S. v. Marashlian*, No. 1:08-cr-00900-FB-1 (E.D.N.Y. March 9, 2011), ECF No. 112. (*See also,* Gilmore Decl. Ex. 11, Flynn Dep. Tr. 95-96). Mr. Marashlian is now deceased. (Gilmore Decl. Ex. 11, Flynn Dep. Tr. 94:3-4). In a related matter, Perini agreed to settle civil claims asserted by the United States Department of Justice with a payment of a civil penalty on or about October 30, 2009.

> **Disputed and immaterial.** The proposed statement of fact was not cited in Usiminas' memorandum of law and does not form the basis of Usiminas' motion for summary judgment. Therefore, the proposed fact is immaterial and inadmissible for purposes of Usiminas' motion for summary judgment and should be stricken from Usiminas' Rule 56.1 Statement.

23.   As verified by Terrence M. Flynn, POG submitted a change order to the TBTA on May 1, 2012 concerning the bonded aggregate surfacing ("BAS") for the Project, whereby POG disclaimed liability and asserted that any problems with the BAS were attributable to a design defect and the responsibility of TBTA. (Gilmore Decl., Ex. 11, Flynn Dep. Tr. 57-62, 65-68; Gilmore Decl., Ex. 9, BAS Change Order, p. 4).

DM1\4657985.1

**Disputed and immaterial.**  The proposed statement of fact was not cited in Usiminas' memorandum of law and does not form the basis of Usiminas' motion for summary judgment.  Therefore, the proposed fact is immaterial and inadmissible for purposes of Usiminas' motion for summary judgment and should be stricken from Usiminas' Rule 56.1 Statement.

Dated: May 7, 2014

DUANE MORRIS  LLP

By:  *Michael J. Hogan*
Michael J. Hogan
DUANE MORRIS LLP
1540 Broadway
New York, New York  10036
Tel.: (212) 692-1000
Fax: (212) 692-1020
E-mail: mjhogan@duanemorris.com

*Attorneys for Plaintiff Perini/O&G, A Joint Venture*

DM1\4657985.1